**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
NEW YORK**

THE FORTUNE SOCIETY, INC.
29-76 Northern Blvd.
Long Island City, NY 11101

        Plaintiff,

    v.

iAFFORD NY, LLC
670 Myrtle Ave., #134
Brooklyn, NY 11205

        Defendant.

Civil Action No.   1:22-cv-06584

<u>**COMPLAINT AND JURY DEMAND**</u>

1

## INTRODUCTION

1.      The Fortune Society ("Fortune") brings this suit pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq*., the New York State Human Rights Law, NY Exec. Law § 296(A), and the New York City Human Rights Law, NYC Admin. Code § 8-107(5), for injunctive, monetary, and declarative relief against Defendant iAfford NY, LLC ("iAfford") for engaging in a pattern or practice of illegal discrimination on the basis of race, color, and national origin in the marketing and screening of affordable housing units.

2.      Fortune is a not-for-profit organization that for over fifty years has been dedicated to the successful reentry and reintegration of formerly incarcerated individuals in New York City ("the City"). It is one of the leading organizations in the country addressing and helping individuals overcome reentry issues.

3.      Fortune serves approximately 9,000 clients in a typical year, approximately 90% of whom are Black or Latino.[1] Among the comprehensive services it offers its clients, one of Fortune's principal tasks is to secure housing for its clients and their families. Fortune not only operates its own housing facilities, but it also works to place its clients in permanent housing, including in New York City-assisted affordable housing units. Placing clients in external housing both advances Fortune's central mission and has the practical benefit of freeing up more room in Fortune's own housing facilities, thereby enabling Fortune to serve more clients.

4.      As an official marketing agent and monitor for New York City's Department of Housing Preservation and Development ("HPD"), Defendant iAfford manages the selection process for hundreds, if not thousands of City-assisted affordable housing units in more than

---

[1] Throughout this Complaint, except where otherwise noted, "white" refers to non-Hispanic white, "Black" refers to non-Hispanic African American/Black, and "Latino" refers to Hispanic/Latino of any race.

100 developments across the City. Despite HPD's explicit prohibition of discrimination against applicants based on their criminal justice involvement, iAfford maintains a practice of excluding justice-involved individuals from renting the affordable housing units in its portfolio. This practice amounts to a blanket ban—iAfford rejects all applicants with a criminal record regardless of the nature of the conviction, age at the time of the offense, or evidence of rehabilitation, among other relevant factors.

5.    Fortune learned about this practice in the course of its regular activities assisting clients in the search for affordable housing opportunities. In April 2021, a client staying at a temporary shelter applied to an iAfford-marketed apartment. With a City-sponsored rental assistance voucher and meeting other qualifications, he was eager to find an apartment that would allow him to get back on his feet. But iAfford denied his application at the pre-screening stage solely because he had a past conviction. iAfford did not engage in an individualized assessment of his case. Nor did it respond to his efforts to appeal his denial and demonstrate his suitability for the unit. Because of his criminal justice involvement, he was summarily rejected.

6.    Given the implications of this rejection for one of Fortune's core projects— finding housing for formerly incarcerated individuals—Fortune was compelled to investigate the scope of iAfford's conduct. In three recorded calls between August and December 2021, three different iAfford employees corroborated that iAfford maintains a practice of categorically discouraging and/or rejecting applicants with a record of criminal conviction.

7.    Defendant's practice has the purpose and effect of discriminating against Black and Latino prospective applicants, including Fortune's clients, who are disproportionately represented in the justice-involved population.

8.    Locally and nationally, blanket bans like the one maintained and enforced by

Defendant have a clear and unlawful disparate impact on Black and Latino individuals. The disproportionate rates of conviction and incarceration of Black and Latino people, as compared to white people, are well-documented. Banning people from safe and affordable housing based solely on a criminal conviction thus has a predictable and significant adverse impact on Black and Latino individuals.

9.      In fact, because of these well-established racial disparities among individuals with criminal records, Defendant's blanket ban operates to exclude income-eligible Black and Latino individuals from living in its marketed properties at substantially higher rates than that at which white individuals are excluded.

10.     There exists an obvious and ready-made less discriminatory alternative for contending with any concerns raised by applicants with criminal records: individualized review. HPD has long required its marketing agents to evaluate applicants' justice involvement consistent with guidance issued by the U.S. Department of Housing and Urban Development ("HUD") in April 2016 and reaffirmed in June 2022, both of which recommend individualized review as a less discriminatory alternative. As of August 2021, HPD actually *requires* all marketing agents to engage in an individualized review of an applicant's justice involvement, which should be well known to iAfford because it serves as an HPD compliance monitor. By imposing a blanket ban, iAfford is in clear violation of HUD and HPD requirements and knowingly excludes a disproportionate number of Black and Latino applicants.

11.     iAfford's actions have directly and significantly diminished and frustrated Fortune's ability to provide safe and stable housing for its clients.  iAfford's actions have also caused Fortune to expend substantial additional resources to identify alternative housing options for its clients and to increase its housing advocacy efforts. iAfford's practices have

further forced Fortune to divert resources from other programmatic activities to investigate and counteract iAfford's discriminatory conduct.

12.     Plaintiff Fortune accordingly brings this suit against Defendant iAfford to (1) prevent Defendant from continuing its discriminatory and unlawful conduct at the affected properties and ensure that applicants injured by iAfford's practices will have a meaningful opportunity to secure desperately needed affordable rental housing; and (2) redress the harm Fortune has suffered as a direct result of Defendant's conduct.

## PARTIES

13.     Plaintiff The Fortune Society, Inc. is a not-for-profit corporation organized under the laws of New York State with headquarters in Long Island City and offices throughout New York City. Fortune is dedicated to assisting formerly incarcerated individuals and their families through advocacy and the provision of reentry services, including housing, employment assistance, substance abuse counseling, and other services.

14.     Defendant iAfford NY, LLC is a New York limited liability company headquartered in Brooklyn, NY. Its address for service of process on file with the New York State Department of State is 670 Myrtle Ave., #134, Brooklyn, NY, United States, 11205. iAfford was founded on November 21, 2018.

15.     In acting or omitting to act as alleged herein, Defendant was acting through its employees and/or agents and is liable on the basis of the acts and omissions thereof.

16.     In acting or omitting to act as alleged herein, each employee or officer of Defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as an iAfford agent were subsequently ratified and adopted by Defendant as principal.

5

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613. This

Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein

arise under the laws of the United States.  This Court has supplemental jurisdiction over the

NewYork State Human Rights Law ("NYSHRL") and New York City Human Rights Law

("NYCHRL)" claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant

conducts business in and is a resident of the district and a substantial part of the events and

omissions giving rise to the claims occurred in the district.

**FACTUAL BACKGROUND**

**I.      THE FORTUNE SOCIETY SERVES INCARCERATED AND FORMERLY
          INCARCERATED INDIVIDUALS**

19.     Founded in 1967, The Fortune Society's mission is to help incarcerated and

formerly incarcerated individuals become contributing members of society and to offer

alternatives to incarceration. Fortune offers a holistic array of programs for formerly

incarcerated, low-income persons in New York City through a "one-stop shop" model of

services that includes housing, case management, counseling, education, employment services,

substance abuse treatment, family services, health services, and mental health services, among

others.

20.     Fortune serves approximately 9,000 individuals annually. Black and Latino

individuals comprise over 90% of Fortune's clients.

21.     Because of the vital importance of safe and stable housing to successful reentry,

one of Fortune's principal tasks is to secure housing for its clients and their families. This is

central to Fortune's mission. Many of Fortune's housing programs work together as a pipeline,

with individuals moving from emergency to "phased permanent" to permanent housing as part of their successful reintegration.

22.     At any point in time, Fortune provides temporary or permanent housing for more than 300 formerly incarcerated people. Fortune provides emergency and transitional housing to formerly incarcerated individuals experiencing homelessness, and it also owns and/or operates two housing facilities providing permanent housing options for its clients. Given the outsized need for permanent housing options, Fortune has a pipeline to add three additional permanent housing facilities.

23.     Demand for emergency beds at Fortune-run housing facilities is always high because many people are released every week from jail and prison into New York with no viable housing options. Fortune's emergency housing unit is typically filled to capacity, and Fortune is frequently forced to turn people away due to a lack of space. Fortune's permanent housing facilities have similarly limited capacity, with demand far exceeding available units. Thus, Fortune cannot rely on its own facilities alone to provide permanent housing to most of its clients.

24.     Fortune therefore seeks to provide safe and stable permanent housing for its clients through the private rental housing market throughout New York City.

25.     The lack of affordable housing options available to the formerly incarcerated in New York City severely hampers Fortune's housing pipeline. While Fortune's model is to move individuals housed in the emergency unit to transitional or external permanent housing within approximately 45 days, individuals often stay in the emergency unit for as many as eight or nine months.  Similarly, the process of finding and moving from transitional to permanent housing often takes a year or more. These delays are largely driven by a lack of affordable housing

opportunities and blanket bans that exclude individuals with criminal histories from living in rental housing.

## II.   iAFFORD ACTS AS A GATEKEEPER TO CITY-FUNDED AFFORDABLE HOUSING OPPORTUNITIES

26.     As a marketing agent, iAfford manages the application and selection process for City-assisted affordable housing units in more than 100 developments throughout more than 40 neighborhoods across New York City's five boroughs. iAfford also serves as a marketing monitor for developments with City-assisted units and is therefore tasked with monitoring developers' compliance with affordable housing regulations and HPD requirements.

### A.   iAfford Is a Marketing Agent Required to Meet HPD Policies in Managing the Application and Selection Process for Affordable Housing Units.

27.     iAfford is retained by developers who participate in the Affordable New York Housing Program ("ANY"). ANY is a residential property tax exemption program, which grants tax breaks to private developers of new residential properties in exchange for owners' allocation of 25-30% of the dwelling units as affordable housing. These units are then rented to eligible applicants through the NYC Housing Connect lottery system ("Housing Connect"), an online application system for City-assisted permanent affordable housing.

28.     HPD-approved marketing agents like iAfford facilitate and manage the marketing and resident selection for these developments in accordance with HPD policies, requirements, and procedures. This role may be filled by developers, owners, sponsors of projects, or third-party agents; iAfford is the latter.

29.     As a third-party agent retained by developers, iAfford acts as an intermediary between developers in the ANY program looking to find tenants, and HPD, which fields applicants from its Housing Connect portal. iAfford boasts that it is "HPD approved and well

8

versed in the Affordable Housing field." iAfford "deal[s] with the applicants to ensure eligibility[,]" handling everything "[f]rom document collection and verification … to finally signing leases." iAfford's "strategy" includes "invest[ing] in the most advanced software, which enables [it] to speedily filter through thousands of tenant applicants…."

30.     Prospective tenants apply to iAfford-marketed units through Housing Connect. iAfford then pre-screens and evaluates their applications and determines if they meet the developers' or owners' requirements. iAfford has discretion to reject applications at that stage. Only if iAfford determines that the applicant meets the developers' requirements does it refer their application to HPD for final review. iAfford thus acts as a gatekeeper for prospective applicants attempting to secure a City-assisted affordable apartment in the developments it markets.

31.     Nearly every day, iAfford markets properties with available units through Housing Connect's open lotteries. iAfford's reach is far and wide, with a portfolio of more than 100 developments that offer hundreds, if not thousands of City-assisted affordable housing units.

**B.      iAfford Is a Marketing Monitor Tasked With Ensuring Compliance With ANY Requirements and Affordable Housing Regulations.**

32.     In addition to acting as a marketing agent, iAfford is an HPD-approved marketing monitor, responsible for monitoring compliance with the ANY program and affordable housing regulations. The ANY program requires that all participating owners or developers execute a monitoring contract with HPD-approved marketing monitors, such as iAfford, who in turn agree to ensure compliance with relevant regulations, including those relating to the leasing of units to eligible applicants.

33.     In advertising its services, iAfford assures developers that it complies with

affordable housing rules and regulations, and that it can help them do so as well. Throughout the benefit period of up to 35 years post-construction, iAfford claims to ensure "consistent compliance," including "[m]onthly rent roll collection, quarterly rent roll submissions to HPD and re-marketing the affordable unit vacancies pursuant to HPD requirements." iAfford advertises that it "knows the roads, follows the rules, and does it right. Always."

### III. FORTUNE WAS UNABLE TO ASSIST ITS CLIENTS WITH RENTING AFFORDABLE APARTMENTS BECAUSE OF iAFFORD'S BLANKET CRIMINAL RECORDS BAN

34.     In the course of its regular activities assisting clients to secure housing, in April 2021, Fortune became aware that iAfford discourages and/or categorically rejects applicants based on justice involvement. Fortune assisted a formerly incarcerated client living in a temporary shelter who applied to rent a City-assisted affordable housing unit marketed by iAfford. The client was eager to find a permanent housing option that would provide much-desired stability and independence. He had a City-sponsored rental assistance voucher and was able to cover the rent amount. He met all the stated requirements for the apartment, and he completed all necessary portions of the application.

35.     The client was surprised and disappointed to learn that his application was denied at the pre-screening stage, solely based on his criminal justice involvement. The pre-screening report stated: "Applicant is **rejected** based on criminal convictions revealed in the pre-screening report."

36.     With Fortune's assistance, the client repeatedly contacted iAfford to inquire about the process to appeal his denial. He received no response. He was not allowed an opportunity to provide any information about the circumstances of his years-old conviction, nor was he allowed to demonstrate that he was qualified to rent the apartment.

37.     Given the potential implications of this rejection for Fortune's efforts to find affordable housing for the formerly incarcerated individuals it serves, Fortune was compelled to investigate the scope of iAfford's conduct to determine whether this was an isolated instance, or a company policy.

38.     In August 2021, a Fortune staff member contacted iAfford to inquire about its policy on applicants with criminal justice involvement. In a recorded call, an iAfford Project Manager replied that "usually people with criminal backgrounds are rejected, like overall." The Project Manager represented that this policy applied to all of iAfford's properties, and that this policy was in line with HPD guidelines and criteria. The Project Manager further discouraged Fortune clients from applying because "it's a long process and then at the end, they're going to be like, aww, I'm rejected. They know all along . . . that they are criminals . . . ."

39.     To confirm whether this blanket ban was categorically applied to potential renters and applicants, Fortune engaged an independent fair housing organization, the Fair Housing Justice Center ("FHJC"), to conduct two additional recorded tests.

40.     In September 2021, an FHJC tester called iAfford to inquire about its policy regarding criminal convictions. In a recorded call, another iAfford Project Manager informed the tester, "if there is any criminal background on [an applicant's] credit report, then we are forced to reject their application." The Project Manager asserted that the type and length of time of the conviction did not matter. Moreover, the Project Manager claimed that "it's not iAfford's policy but it's HPD's…."

41.     In December 2021, a second tester from FHJC called iAfford with a similar inquiry. In a recorded call, the tester asked about iAfford's policy on felony convictions. An iAfford Applicant File Analyst replied, "when they do a credit check if your criminal record

11

shows up on your credit report, then that is going to make you ineligible to proceed." When asked to clarify if this rule applied to all convictions (including misdemeanors), the Applicant File Analyst twice confirmed that was the case. The iAfford employee represented that in categorically excluding applicants with a criminal record, iAfford was following Housing Connect policies.

42.      iAfford's message to prospective tenants—conveyed by three separate employees in three different recorded calls—was clear: If you have *any* past convictions, you will be rejected.

## IV.   iAFFORD'S BLANKET BAN AGAINST JUSTICE-INVOLVED INDIVIDUALS CONSTITUTES UNLAWFUL DISCRIMINATION

43.      Facially neutral housing practices that have a disparate impact on the basis of race, color, or national origin are prohibited by the Fair Housing Act ("FHA") and New York fair housing laws unless they are necessary to achieve a legitimate business purpose that cannot be satisfied through a less discriminatory alternative practice. Policies that categorically deny housing to people with criminal records, including the blanket ban maintained and enforced by iAfford, are unlawful under this standard. Such policies have a severe disparate impact on Black and Latino individuals, and any legitimate safety concerns can be satisfied through the less discriminatory alternative of giving individualized consideration to each potential resident's circumstances and qualifications as a tenant.

### A.   Blanket Bans Based on Criminal History Disproportionately and Severely Impact Black and Latino Individuals.

44.      Racial disparities in the criminal justice system are well-established, persistent, and widely known. Black and Latino individuals are incarcerated at rates significantly disproportionate to their numbers in the United States general population. As of 2020, at the

national level, the overall rate of incarceration of Black individuals was 5.12 times that of white individuals, while the rate of incarceration of Latino individuals was 2.43 times the rate of white individuals.[2]

45.     Men overwhelmingly comprise the nation's population of imprisoned people, and the disparities by race are especially stark among the male population. According to a recent research effort on incarceration and conviction disparities, compared to white men, Black men are 3.7 times more likely to have at least one felony conviction by age 30, while Latino men are 2.3 times more likely.[3] Racial disparities are even larger for rates of incarceration in state prison by age 30, with Black men being almost five times more likely to have been incarcerated than white men, and Latino men being three times as likely.

46.     These disparities persist among released people. Nationally, more than half a million people are released from confinement each year.[4] Largely because the imprisoned population as a whole is disproportionately Black and Latino and 95% of the imprisoned population is eventually released,[5] 65% of the formerly incarcerated population in the United States is Black or Latino.[6]

47.     At the New York State level, racial disparities in criminal justice involvement

---

[2] *See* E. Ann Carson, U.S. Dep't of Just., *Prisoners in 2020*, Bureau of Justice Statistics (Dec. 2021), available at https://bjs.ojp.gov/content/pub/pdf/p20st.pdf.

[3] Michael Mueller-Smith & Keith Finlay, *Inequalities in U.S. Criminal Justice and Economic Outcomes* (Oct. 2020).

[4] Carson, *supra* note 2, at 19.

[5] Devah Pager, *The Mark of a Criminal Record*, 108.5 Am. J. of Sociology 937, 957-60 (2003).

[6] Ames C. Grawert, Cameron Kimble & Jackie Fielding, *Poverty and Mass Incarceration in New York*, The Brennan Center for Justice (2021), available at https://www.brennancenter.org/our-work/policy-solutions/poverty-and-mass-incarceration-new-york-agenda-change; Terry Ann Craigie, Ames C. Grawert & Cameron Kimble, *Conviction, Imprisonment, and Lost Earnings*, The Brennan Center for Justice (2020), available at https://www.brennancenter.org/our-work/research-reports/conviction-imprisonment-and-lost-earnings-how-involvement-criminal.

mirror or exceed the national disparities described above.[7] While Black and Latino individuals comprise 17.6% and 19.5% of the New York State population, respectively, as of January 1, 2021, 50% of incarcerated individuals under custody were Black, while almost 25% were Latino.[8] Moreover, three-quarters (or 75%) of the State's formerly imprisoned population is Black or Latino.[9] As recently as in 2015, 46% of the people released were Black, while 23% were Latino.[10] These percentages were consistent with the percentage of Black and Latino people under custody.

48.     On the other hand, white people are incarcerated and released from jails and prisons at rates significantly lower than their representation in the general population at the national and state levels.

**B.     iAfford's Blanket Ban Disproportionately and Severely Impacts Black and Latino Individuals.**

49.     As is generally the case with blanket bans, due to the wide and persistent racial disparities described above, iAfford's blanket ban has a clear disparate impact on the basis of race, color, and national origin. Black and Latino individuals are far more likely than white individuals to have a criminal record. As a result, iAfford's blanket ban operates to disqualify otherwise-qualified Black and Latino individuals from living in its marketed properties at disproportionate rates. When narrowing the analysis to the qualified applicant pool, these disparities persist.

---

[7] Grawert et al., *supra* note 6.
[8] N.Y. State Dep't of Corrections and Cmty. Supervision, *Under Custody Report* (2021), available at https://doccs.ny.gov/system/files/documents/2022/04/under-custody-report-for-2021.pdf.
[9] Grawert et al., *supra* note 6.
[10] N.Y. State Dep't of Corrections and Cmty. Supervision, 2015 Releases From Custody (2021), available at https://doccs.ny.gov/system/files/documents/2021/11/2015-releases_three-year-post-release-follow-up_final_20211117.pdf.

50.     iAfford's portfolio includes properties across all five boroughs, and upon information and belief, its properties attract potential tenants from all over New York City. To qualify for the City-assisted affordable units marketed by iAfford, prospective tenants must meet income eligibility requirements based on the Area Median Income ("AMI") in New York City. Under the ANY program, to take advantage of tax credits and benefits, developers must reserve a set percentage of units for individuals with incomes of up to 40% of AMI, up to 60% of AMI, or up to 130% of AMI. Thus, to be eligible for affordable housing units, single applicants in New York City must have a maximum income of $37,360 (or 40% AMI), $56,040 (or 60% AMI), or $121,420 (or 130% AMI).[11]

51.     The percentage of units at each AMI level varies, but iAfford markets units at a range of income levels. For example, iAfford has previously listed 44 studio units at 869 Myrtle Ave., Brooklyn, NY for single applicants earning between $37,886 and $50,160; 5 studio units at 2245 Creston Ave., Bronx, NY for single applicants earning between $48,000 and $103,000; 9 studio units at 56 Ainslie St, Brooklyn, NY for single applicants earning between $51,738 and $66,880; and 3 studio units at 104 Linden Blvd., New York, NY for single applicants earning between $54,858 and $108,680.

52.     Using data from the United States Census Bureau, the Bureau of Justice Statistics, the Bureau of Labor Statistics, and the Criminal Justice Administrative Records System, the likely racial composition of City residents who have criminal records and annual incomes within these AMI limits can and has been ascertained through an independent analysis.

53.     A conservative analysis shows that 10% of Black men and 3.1% of Latino men

---

[11] *See* N.Y. Dep't of Hous. Pres. & Dev., *Area Median Income*, available at https://www1.nyc.gov/site/hpd/services-and-information/area-median-income.page (last visited Aug. 19, 2022).

with an income under $25,000 per year would be excluded from iAfford-marketed units due to a past felony conviction, as opposed to only 1.2% of white men in that income bracket. That is, Black men earning less than $25,000 would be 8.1 times more likely than white men to be disqualified by iAfford's blanket ban, while Latino men would be 2.5 times as likely to be disqualified.

54.    In the $25-$50,000 income range, 8.4% of Black men and 4.9% of Latino men would be excluded due to a felony conviction, as opposed to only 2% of white men. In other words, Black men in that income range are 4.1 times more likely than white men to be disqualified by iAfford's policy, while Latino men are 2.4 times as likely to be disqualified.

55.    Statistically significant disparities persist in the $50-$100,000 income range. Within this bracket, 4.9% of Black men and 5.8% of Latino men would be excluded, compared to only 2.4% of white men. That means that otherwise qualified Black men in that income range would be twice as likely as white men to be disqualified by iAfford's blanket ban, and Latino men would similarly be 2.4 times as likely to be disqualified.

56.    This analysis understates actual disparities, considering that iAfford's stated practice is to exclude applicants with *any* convictions, rather than just felony convictions. Indeed, alternative statistical models indicate that the disparate impact caused by Defendant's blanket ban may be significantly greater.

57.    The racially disparate impact of Defendant's blanket exclusion of justice-involved individuals on otherwise eligible Black and Latino prospective tenants is clear from these findings.

**C.** **Giving Individualized Consideration to Applicants' Circumstances Is a Less Discriminatory Alternative That Would Satisfy Safety Concerns**

58. Defendant's blanket ban is not necessary to achieve any legitimate nondiscriminatory business purpose. While iAfford may argue that categorically excluding Fortune's clients (and any other justice-involved applicants) is justified by public safety concerns, blanket bans are not necessary to satisfy that concern. Rather, providing individualized consideration to each applicant's circumstances is a less discriminatory alternative that would serve public safety equally well.

59. Nor can iAfford rely on any concerns related to negative housing outcomes, such as failure to pay rent or lease terminations. In fact, a recent study found that most criminal offenses have no significant effect on housing outcomes.[12] To the extent that a prior criminal offense may increase the likelihood of any negative housing outcomes, any such effect declines over time and becomes insignificant two years after a misdemeanor, and five years after a felony. A categorical ban that fails to account for the nature of the conviction, as well as other relevant factors, and/or applies an unreasonable lookback period, is therefore unnecessary to address any such concerns.

60. iAfford may protect public safety and prevent negative housing outcomes by employing an individual assessment that considers the nature of an individual's conviction, age at the time of the conduct, the amount of time since the conviction, and evidence of rehabilitation, among other factors. Such an individualized assessment allows justice-involved individuals who pose no realistic current or future threat to the community to obtain housing.

---

[12] *See* Cael Warren, *Success in Housing: How Much Does Criminal Background Matter?*, Wilder Research (Jan. 2019), available at https://www.wilder.org/sites/default/files/imports/AEON_HousingSuccess_CriminalBackground _Report_1-19.pdf (last visited Aug. 19, 2022).

This more targeted and narrower approach both protects public safety and is less discriminatory and exclusionary because it reduces the number of Black and Latino applicants who would be banned from iAfford-marketed properties.

61.     This framework is not only reasonable, but it is well-established as a less discriminatory alternative by HUD, and it is *required* by HPD.

62.     In 2016, HUD issued guidance on the use of criminal records in housing transactions, recognizing that "[b]ecause of widespread racial and ethnic disparities in the U.S. criminal justice system, criminal history-based restrictions on access to housing are likely disproportionately to burden African Americans and Hispanics."[13] It specifically warned that "[a] housing provider that imposes a blanket prohibition on any person with any conviction record—no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then—will be unable to meet [their] burden" to show that such a policy is necessary to achieve a substantial, legitimate, nondiscriminatory interest precisely because an individualized assessment that accounts for relevant mitigating information, such as the circumstances surrounding the criminal conduct, the age of the individual at the time of the conduct, their history as a tenant, and evidence of rehabilitation, is an obvious less discriminatory alternative to categorical exclusions.

63.     As of January 2020, HPD expressly incorporated this guidance in its instructions to its marketing agents, directing that "[a]ny rejection based on criminal justice information, pursuant to the Marketing Plan, must be consistent with current HUD guidance"

---

[13] U.S. Dep't of Hous. & Urb. Dev., *Guidance on Application of Fair Housing Act Standards to the use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* (Apr. 4, 2016), available at https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHA STANDCR.PDF [hereinafter "2016 Guidance"].

and that "HUD Guidance supersedes any contradictory information in the Marketing Plan."[14]

64.     In a June 2022 Memorandum, HUD reaffirmed those principles and provided additional guidance and recommendations to facilitate implementation of the 2016 Guidance.[15] The June 2022 Memorandum recognized that housing providers' "written and unwritten policies and practices" concerning background screening may create an unjustified discriminatory effect in violation of the FHA, and reaffirmed that individualized assessment of relevant mitigating information from applicants with criminal justice involvement is likely to have a less discriminatory effect than categorical exclusions like iAfford's.

65.     Consistent with HUD's Guidance and Memorandum, as well as other applicable anti-discrimination laws, regulations, and policies, HPD has issued detailed guidelines requiring that HPD-approved marketing agents engage in a substantive, multi-step individualized inquiry of justice-involved individuals.[16] Pursuant to these HPD guidelines, housing providers may only consider convictions for a limited list of offenses that involve physical violence or adversely affect the health, safety, and welfare of other people. HPD guidelines specify that such convictions are "not grounds for automatic rejection." Rather, housing providers must engage in an individualized analysis that considers the age of the applicant at the time of the offense, the

---

[14] N.Y. Dep't of Hous. Pres. & Dev., *Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy* (Jan. 2020), available at https://web.archive.org/web/20201115182027/https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/marketing-handbook.pdf.

[15] U.S. Dep't of Hous. & Urb. Dev., *Implementation of the Office of General Counsel's Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real-Estate Transactions* (June 10, 2022), available at https://www.hud.gov/sites/dfiles/FHEO/documents/Implementation%20of%20OGC%20Guidance%20on%20Application%20of%20FHA%20Standards%20to%20the%20Use%20of%20Criminal%20Records%20-%20June%2010%202022.pdf [hereinafter "June 2022 Memorandum"].

[16] N.Y. Dep't of Hous. Pres. & Dev., *Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy* (Aug. 2021), available at https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/marketing-handbook-8-21.pdf.

amount of time elapsed since the date of conviction, and evidence of rehabilitation or good conduct, among other factors.

66.     iAfford meets none of these requirements, and in fact, its policy as stated and applied is just the opposite. iAfford automatically excluded Fortune Society's client solely because of a past conviction in April 2021 and refused Fortune Society's efforts to appeal the denial. It most certainly did not engage in an individualized review. And under the current HPD policies, iAfford would not have been permitted to even consider the type of conviction that resulted in the automatic denial of Fortune Society's client.

67.     In the recorded calls with Fortune staff and FHJC testers, iAfford employees repeatedly confirmed that iAfford automatically excludes anyone with a conviction, with no regard for the type of conviction or underlying offense. Because it categorically rejects justice-involved applicants, iAfford does not consider factors such as their age at the time of the offense or any mitigating circumstances.

68.     To make matters worse, iAfford disguises its offending blanket ban as an HPD policy, telling prospective applicants that it is required by or consistent with HPD guidelines. In so doing, iAfford not only discourages and excludes eligible applicants from the affordable units it oversees, but it also discourages justice-involved applicants from applying to *any* City-assisted affordable housing opportunities. The effects of iAfford's blanket ban thus extend far beyond its market reach.

69.     By flouting the above HUD guidance and HPD requirements, iAfford not only disregards its obligations as an HPD-approved marketing agent and monitor, but it also knowingly violates the fair housing laws and regulations underlying these.

V.       **DEFENDANT MAINTAINS ITS CRIMINAL BACKGROUND BAN TO INTENTIONALLY DISCRIMINATE AGAINST BLACK AND LATINO PEOPLE**

70.      iAfford's intent to limit Black and Latino people from applying to live at the City-assisted units it markets is clear from the categorical manner by which it knowingly discourages and rejects justice-involved individuals in clear violation of applicable law and regulation.

71.      First, the disparate impact of Defendant's blanket ban is so large and foreseeable that Defendant's intent to discriminate against Black and Latino applicants can be inferred. The rates at which prospective Black and Latino tenants are adversely affected by iAfford's practices is dramatically larger than the rate at which prospective white tenants are affected. As described above, otherwise-qualified Black applicants are up to eight times more likely than white applicants to be barred from iAfford-marketed properties, and Latino applicants are up to 2.5 times more likely than white applicants to be excluded.

72.      In addition to the sheer breadth of these disparities, iAfford should also be aware of the discriminatory effects of its practices as an affordable housing provider in New York City. Since at least 2016 and as recently as June 2022, HUD has publicized that exclusionary practices like iAfford's disproportionately burden Black and Latino people.

73.       iAfford also has direct and specific knowledge of this discriminatory effect because it serves as an HPD monitor. iAfford therefore must be—and describes itself as—"well versed" in the HPD policies, which expressly state that excluding applicants based on justice involvement may constitute unlawful discrimination. Despite this knowledge and awareness, iAfford maintains exactly the type of policy that both HPD and HUD reject.

74.      iAfford's intent to discriminate can similarly be inferred from the fact that it has

knowingly rejected the individualized assessment process that HPD contemplates, even though HPD explicitly requires this process to mitigate the risk of a disparate impact.

75.     In sum, iAfford deliberately chose to implement and maintain the more discriminatory method for criminal record screening—automatic rejection—and thereby excludes a greater number of prospective tenants who are Black and Latino. One can infer from this knowing and informed decision that the foreseeably disparate outcome identified by HPD and HUD is exactly the outcome intended by iAfford.

### INJURY TO THE FORTUNE SOCIETY

76.     The harm inflicted by Defendant's discriminatory blanket ban is great not only in terms of the sheer number of people affected, as shown above, but also in terms of the devastating consequences for each affected individual trying to reenter society. Preventing this harm, or at the very least minimizing it, is central to Fortune's mission.

77.     Fortune has been directly and substantially harmed by iAfford's policy and practice of discouraging and categorically excluding formerly incarcerated individuals and others with criminal records. Defendant's discriminatory actions have frustrated Fortune's mission of ensuring that formerly incarcerated people can successfully reenter society and obtain safe and stable housing, forced it to divert resources to address iAfford's discrimination, and diminished its ability to carry out other programs and initiatives.

78.     Fortune's mission is to ensure that incarcerated and formerly incarcerated individuals become contributing members of society and to offer alternatives to incarceration. As explained above, access to housing is foundational to this mission. Fortune conducts fair housing investigations and advocates for clients who have been victims of housing discrimination. In addition to working with its clients to obtain housing, Fortune addresses the

stabilization needs of formerly incarcerated individuals through educational programs and

activities including, but not limited to, educational and outreach efforts, trainings and technical

assistance, webinars, conferences, publications, community events, and social media alerts.

Fortune also works to increase the awareness of policymakers of fair housing issues by meeting

with local, state, and federal officials to advocate for strong fair housing laws and policies.

79.     For example, in April 2022, Fortune conducted a Technology Fair for its clients.

As part of a housing panel, Fortune hosted an HPD Outreach Coordinator, who provided

information to Fortune's clients on finding and applying for affordable rental housing

opportunities through Housing Connect. Fortune's client outreach efforts like this panel are

directly undermined by iAfford's discriminatory policy to screen out and reject justice-involved

individuals who would otherwise apply via Housing Connect.

80.     Defendant's discriminatory conduct frustrated Fortune's mission by interfering

with its mission-related activities, impairing its ability to achieve its goals of ensuring equal

access to housing opportunities for justice involved individuals, and, as described above,

harming the community that Fortune serves.

81.     Defendant's discriminatory conduct thus forced Fortune to engage in numerous

activities to counteract the real-world effects of Defendant's unlawful conduct, policies, and

practices. Among other things, after learning about iAfford's policy of discouraging and

categorically rejecting justice-involved individuals from affordable housing opportunities,

Fortune was forced to divert scarce resources it could have used to provide housing and other

services to instead identify, investigate, and counteract iAfford's discriminatory conduct.

82.     Fortune staff has expended a significant number of hours investigating iAfford's

unlawful police and practices. This investigation included interviewing the Fortune client who

was rejected by iAfford; helping them advocate for themselves and request relevant information

to appeal the denial; conducting phone calls with housing case managers who worked with the

Fortune client or submitted housing applications on their behalf; collecting and reviewing

documentation (including the denial); researching iAfford's policies; and calling iAfford to

inquire about the scope of iAfford's discriminatory policy while advocating on behalf of the

participant and the right of Fortune clients to access affordable housing.

83.     Fortune has also expended time and financial resources in coordinating FHJC's

investigation of iAfford's practices.

84.     In addition, Fortune has diverted resources to education and outreach efforts

directly and specifically aimed at countering iAfford's discrimination. After learning about

iAfford's discriminatory practices, Fortune was compelled to invest significant resources in

training videos and other advocacy resources to educate advocates and housing providers about

this issue and rebut the impression that such categorical bans are permissible.

85.     In direct response to iAfford's discrimination, Fortune specifically allocated

$11,000 to create advocacy videos that address bans like the one enforced by iAfford. In

addition to the hard costs of these videos, Fortune staff spent scarce and valuable time on their

production, time that would have otherwise gone toward serving Fortune's clients.

86.     iAfford's blanket ban on justice involved individuals seeking affordable housing

has also disrupted the housing pipeline from temporary to phased-permanent to permanent

housing Fortune provides to its clients. For many of Fortune's clients, City-assisted affordable

housing opportunities are the only accessible permanent housing option. Due to iAfford's

discriminatory practices, Fortune must continue to provide temporary housing and support to

individuals who would otherwise be qualified for these affordable housing opportunities. But for

24

the need to address iAfford's practices, Fortune would have directed these resources to other efforts to further its mission.

87.     Housing discrimination frustrates Fortune's dual mission to provide services to justice-involved individuals, and to advocate on criminal justice issues. In particular, providing housing services and advocating for clients' housing opportunities are the cornerstone of Fortune's work, as housing is critical to its clients' stability and ability to successfully reenter society.

88.     In carrying out activities to counteract the harm caused by Defendant, Fortune experienced a drain in its limited resources that negatively affected its ability to function and operate. Fortune was forced to divert significant staff time and funds away from other planned activities to engage in counteraction, for which it did not originally budget time or money. Counteracting unlawful conduct by Defendant prevented Plaintiff from engaging in other activities that are important to its mission. For example, Fortune staff was forced to divert time and resources they would have otherwise been able to spend helping Fortune clients put together housing applications and support packets, advocating for legislation protecting formerly incarcerated individuals from discrimination, and engaging on education and outreach efforts.

89.     Until redressed and permanently ceased, iAfford's unlawful, discriminatory actions will continue to injure Fortune Society by, for example:

      a.     Interfering with efforts and programs intended to facilitate the successful reentry into society of justice-involved individuals, including the provision of safe and stable housing opportunities;

      b.     Requiring the commitment of scarce resources, including substantial staff time and funding, to investigate and counteract iAfford's

discriminatory conduct, thus diverting those resources from Fortune's other activities and services; and

c.       Frustrating Fortune's mission and purpose of providing services to justice-involved individuals and advocating on criminal justice issues.

90.       Defendant's discriminatory policies and practices are intended to deny and discourage, and have the effect of denying and discouraging, formerly incarcerated people an opportunity to obtain affordable rental housing in the New York City region. These policies and practices adversely affect Black and Latino people, are not justified by any legitimate business need or necessity, and cause injury to Fortune.

91.       Defendant has engaged in the discriminatory conduct described herein intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the rights of Fortune and the substantial harm caused to its clients.

92.       Within 10 days of the commencement of this action, Plaintiff will provide notice of this action to the New York City Commission on Human Rights and Corporation counsel, pursuant to the New York City Administrative Code § 8-502(c).

## CAUSES OF ACTION

### Count I (Race Discrimination—42 U.S.C. § 3604)

93.       Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 92 above.

94.       Defendant's acts, policies, and practices have an adverse and disproportionate impact on Black and Latino individuals in New York City as compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Defendant's blanket policy of automatically refusing housing to all people with criminal records with no

26

consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

95.     Defendant's acts, policies, and practices have been carried out with the intent to discriminate on the basis of race, color, and national origin. Defendant has adopted and maintained an exclusionary policy regarding the use of criminal records with the intent and expectation that the policy disproportionately prevents Black and Latino individuals from obtaining access to housing.

96.     Defendant's acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604, and its implementing regulations, in that:

    a.      Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race and/or color and/or national origin, in violation of 42 U.S.C. § 3604(a);

    b.      Defendant's acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race and/or color and/or national origin, in violation of 42 U.S.C. §3604(b); and

    c.      Defendant's notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race and/or color and/or national origin, in violation of 42 U.S.C. § 3604(c).

### Count II (Race Discrimination—N.Y. Exec. Law § 296 (5))

97.     Plaintiff repeats and incorporates by reference all allegations set forth in

Paragraphs 1 through 92 above.

98.     Defendant's acts, policies, and practices have an adverse and disproportionate impact on Black and Latino individuals in New York City as compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Defendant's blanket policy of automatically refusing housing to all people with criminal records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

99.     Defendant's acts, policies, and practices have been carried out with the intention of discriminating on the basis of race, color, and national origin. Defendant has adopted and maintained an exclusionary policy regarding the use of criminal records with the intent and expectation that the policy disproportionately prevents Black and Latino individuals from obtaining affordable housing.

100.    Defendant's acts, policies, and practices constitute discrimination and violate the New York State Human Rights Act, N.Y. Exec. Code § 296(5), in that:

> a.      Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race and/or color and/or national origin, in violation of N.Y. Exec. Code § 296(5)(a)(1);

> b.      Defendant's acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race and/or color and/or national origin, in violation of N.Y. Exec. Code § 296(5)(a)(2);

c.      Defendant's notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race and/or color and/or national origin, inviolation of N.Y. Exec. Code § 296(5)(a)(3); and

d.      To the extent that any Defendant acted in its capacity as a real estate broker or agent, its actions also violate N.Y. Exec. Code § 296(5)(c)(1)-(2).

### Count III (Race Discrimination—Admin. Code of City of NY § 8-107(5))

101.    Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 92 above.

102.    Defendant's acts, policies, and practices have an adverse and disproportionate impact on Black and Latino individuals in New York City as compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Defendant's blanket policy of automatically refusing housing to all people with criminal records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

103.    Defendant's acts, policies, and practices have been carried out with the intention of discriminating on the basis of race, color, and national origin. Defendant has adopted and maintained an exclusionary policy regarding the use of criminal records with the intent and expectation that the policy disproportionately prevents Black and Latino individuals from obtaining affordable housing.

104.    Defendant's acts, policies, and practices constitute discrimination and violate the New York City Human Rights Act, Administrative Code of City of N.Y. § 8-107(5), in that:

a.    Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race and/or color and/or national origin, in violation of Administrative Code of City of N.Y. § 8-107(5)(a)(1);

b.    Defendant's acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race and/or color and/or national origin, in violation of Administrative Code of City of N.Y. § 8-107(5)(a)(2);

c.    Defendant's notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race and/or color and/or national origin, inviolation of Administrative Code of City of N.Y. § 8-107(5)(a)(3); and

d.    To the extent that any Defendant acted in its capacity as a real estate broker or agent, its actions also violate Administrative Code of City of N.Y. § 8-107(5)(c)(1)-(2).

## DEMAND FOR JURY TRIAL

105.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1)    Enter a declaratory judgment finding that the foregoing actions of Defendant violate 42 U.S.C. § 3604, New York Exec. Law § 296(5), and Administrative Code of City of New York § 8-107(5);

(2)     Enter an injunction enjoining Defendant and its directors, officers, agents, and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein and directing Defendant and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3)     Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its injuries caused by the conduct of Defendant alleged herein;

(4)     Award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendant for the willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)     Award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2), N.Y. Exec. Code § 297(10), and Administrative Code of City of N.Y. § 8-502(g);

(6)     Award prejudgment interest to Plaintiff; and

(7)     Order such other relief as this Court deems just and equitable.


DATE: October 28, 2022                     Respectfully Submitted,
                                           /s/ Valerie D. Comenencia Ortiz
                                           John Relman*
                                           Lila Miller*
                                           Valerie D. Comenencia Ortiz*
                                           Edward K. Olds (Bar # 5685946)
                                           RELMAN COLFAX PLLC
                                           1225 19th Street NW, Suite 600
                                           Washington, DC 20036

Tel: 202-728-1888
Fax: 202-728-0848
jrelman@relmanlaw.com
lmiller@relmanlaw.com
vcomenenciaortiz@relmanlaw.com
tolds@relmanlaw.com

*Pro Hac Vice Application To Be Submitted*